UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANNE M. MONTESANO,

                          Plaintiff,

- vs -

                                               **Civil Action No.**
                                               **10-cv-6676L(P)**

WESTGATE NURSING HOME, INC. and
AGNES GAULIN as an Aider and Abettor,

                          Defendants.


**PLAINTIFF ANNE M. MONTESANO'S
MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**


**DAVIDSON FINK LLP**
Andrew M. Burns
First Federal Plaza
28 East Main Street, Suite 1700
Rochester, NY 14614
(585) 784-4800

Attorneys for plaintiff
Anne M. Montesano

## **PRELIMINARY STATEMENT**

Plaintiff Anne M. Montesano ("Montesano") submits this memorandum of law in support of her motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on her First and Second Causes of Action in her Amended Complaint against defendants Westgate Nursing Home, Inc. ("Westgate") and Agnes Gaulin ("Gaulin"). (Docket #2).

For the reasons discussed in this memorandum, plaintiff is entitled to partial summary judgment as to liability because defendants illegally discriminated against her because of her disability.

## **FACTS**

Plaintiff is a registered nurse who resides in Rochester, New York and was employed at Westgate from February 2, 2008 until Westgate terminated her employment on September 2, 2009. (Amended Complaint at ¶ 5) (Montesano Dep. at 5, 15, 44).

During her employment with Westgate, plaintiff had a disability consisting of a vitamin B-12 deficiency that limited plaintiff's ability to walk and plaintiff's fine motor skills as well macular degeneration that limited plaintiff's ability to see close-up objects with her right eye. Plaintiff required the use of a walker to ambulate since 1996. (Montesano Dep. at 31, 32, 33, 34, 62, 63, 104). Montesano's symptoms did not worsen, but remained stable, during the time she worked for Westgate. (Montesano Dep. at 104)

Westgate operates a nursing home located at 525 Beahan Road, Rochester, New York. (Amended Complaint at ¶ 6) (Docket #2). Gaulin is a registered nurse who resides in North Chili, New York and at all relevant times worked for Westgate either as Assistant Director of Nursing or Director of Nursing. (Amended Complaint at ¶ 7) (Answer at ¶ 1) (Docket #3)

(Gaulin Dep. at 37, 38). During 2009, Westgate employed 333 employees. (Defendants' Response to Interrogatory No. 15 attached as Exhibit E to Burns Affidavit).

Dawn LaMagna ("LaMagna") was Westgate's Director of Nursing from March 2005 until August 1, 2008. (LaMagna Affidavit at ¶1). As the Director of Nursing at Westgate, LaMagna was authorized to hire and terminate employees, including nurses. (LaMagna Affidavit at ¶6).

Prior to February 2008, LaMagna began communicating with Montesano regarding employment at Westgate as a registered nurse. In her capacity as Westgate's Director of Nursing, LaMagna hired Montesano as a registered nurse for Westgate. Montesano started working for Westgate in early February 2008. (LaMagna Affidavit at ¶7) (Montesano Dep. at 13, 15, 18, 19, 20, 21, 67) (Gaulin Dep. at 42, 45, 51, 85, 149).

LaMagna (and Westgate) hired Montesano for a full time desk position primarily to develop care plans for Westgate's residents, as well as to oversee the health care of Westgate's residents and serve as a liaison to Westgate's floor nurses, who were licensed practical nurses. (LaMagna Affidavit at ¶8) (Montesano Dep. at 15, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 38, 40, 43, 47, 51, 67, 75, 76) (Gaulin Dep. at 88, 89, 93).

Montesano's Application for Employment that she submitted to Westgate stated that the position she was applying for was "care plans." (Dep. Exhibit 1 attached as Exhibit C to Burns Affidavit) (Gaulin Dep. at 52).

LaMagna and Westgate expected and required Montesano to assess the care of Westgate's residents, but LaMagna did not expect, and did not require, Montesano to participate in the day to day care and treatment of Westgate's residents. (LaMagna Affidavit at ¶9) (Montesano Dep. at 13, 43, 75, 76).

Prior to being hired by Westgate, Montesano disclosed to LaMagna that Montesano had certain physical disabilities and limitations that affected her mobility and eyesight. As a result, LaMagna and Westgate knew that Montesano would have less mobility than other Westgate nurses. (LaMagna Affidavit at ¶10) (Montesano Dep. at 13, 43, 66, 67) (Gaulin Dep. at 114, 149, 256).

Despite Montesano's limitations and disabilities, LaMagna determined Montesano could perform the essential functions of the job for which Montesano was hired with appropriate and reasonable accommodations. (LaMagna Affidavit at ¶11) (Montesano Dep. at 67, 100).

When Montesano started working at Westgate, she used and required a walker to help her ambulate. (LaMagna Affidavit at ¶11) (Montesano Dep. at 34, 40, 106) (Gaulin Dep. at 90). At some point after Montesano started working at Westgate and before LaMagna left Westgate, LaMagna was criticized by Westgate employee Anita Meyers, who was Westgate's Office Manager, for hiring Montesano because of Montesano's disabilities and limitations. (LaMagna Affidavit at ¶12).

During the time LaMagna worked with Montesano at Westgate, Montesano spent almost all of her time performing her duties while working at her desk, which was located near the nurse's station on the second floor of the building. (LaMagna Affidavit at ¶13) (Montesano Dep. at 22, 40, 43) (Gaulin Dep. 93).

During the time that Montesano and LaMagna worked together at Westgate, Montesano met or exceeded all of LaMagna's expectations as a Westgate employee. LaMagna never had any problem or difficulty with Montesano's work performance. In LaMagna's opinion, Montesano was a fine nurse whose commendable work performance made her an asset to Westgate. (LaMagna Affidavit at ¶14).

Almost immediately after Montesano was hired, Gaulin had concerns about Montesano's use of a walker and the fact that Montesano was totally dependent on it. (Gaulin Dep. at 103, 104, 105). Gaulin acknowledged in her deposition that there was nothing about Montesano's medical condition that would have precluded Montesano from working at Westgate. (Gaulin Dep. at 112).

Gaulin also acknowledged in her deposition that when Montesano was performing her job duties at her desk working on the health care plans, Montesano did not pose or create any threat to the health, safety, and well-being of Westgate and its residents. (Gaulin Dep. at 229, 230, 231).

After LaMagna left Westgate, Westgate and Gaulin substantially changed Montesano's duties. Specifically, Westgate and Gaulin required Montesano to be on the floor much more frequently and required her to perform numerous additional duties that Montesano was not hired to perform. Montesano told Gaulin this was not what she was hired to do and that she was hired only for a desk position, but Gaulin persisted anyways and imposed the additional requirements on Montesano. (Montesano Dep. at 28, 29, 37, 45, 46, 48, 49, 51, 76, 77, 80, 96, 97) (Gaulin Dep. at 119, 120, 122, 126).

Montesano believed Gaulin's directive to Montesano that she needed to be on the floor much more often was a threat to her employment. (Montesano Dep. at 45, 76). Because of her ambulatory issues, and to comply with Gaulin's directive to be out on the floor much more often, Montesano was forced to purchase a scooter with her own funds to satisfy's Westgate and Gaulin's new and substantially different job requirements for her. (Montesano Dep. at 38, 39, 37, 77) (Gaulin Dep. at 123). Gaulin told Montesano that if Montesano did not get the scooter, she would be fired. (Gaulin Dep. at 123, 204).

-4-

[computer] mouse," and she was not proficient using the computer. (Montesano Dep. at 44, 81, 82, 83, 84, 85) (Gaulin Dep. at 154, 155, 156, 158, 159, 160, 163, 166, 167, 169, 170, 172, 173, 174, 175, 177, 178). Westgate never put Montesano on a performance improvement plan. (Gaulin Dep. at 168).

Westgate claims in its Personnel Handbook that it is an equal opportunity employer, but its Personnel Handbook at page 3 merely states the following: "Federal laws prohibit this facility from denying admission to anyone on the basis of race, creed, color, national origin, sex, disability or sponsor." (Dep. Exhibit 4 attached as Exhibit D to Burns Affidavit) (Gaulin Dep. at 59, 61, 62).

According to Westgate's Personnel Handbook at page 15, all new Westgate employees are subject to a probationary period of 90 to 180 days. Montesano passed her probationary period of probation of 90 to 180 days. (Dep. Exhibit 4 attached as Exhibit D to Burns Affidavit) (Gaulin Dep. at 68, 69, 70).

Further, according to Westgate's Personnel Handbook at page 15, all Westgate employees were to receive a performance evaluation upon completion of the first three months of employment and yearly thereafter, and Nursing Department employees were to receive a performance evaluation at six weeks, three months, and annually thereafter. Despite this, Westgate and Gaulin did not provide Montesano with any performance evaluation. (Dep. Exhibit 4 attached as Exhibit D to Burns Affidavit) (Burns Affidavit at ¶ 10 ) (Gaulin Dep. at 64, 65, 66, 68, 168, ).

Westgate did not provide any training to its employees, including Gaulin, with respect to accommodating individuals employed by Westgate with disabilities. (Gaulin Dep. at 236, 237).

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity

Commission on October 21, 2009. On October 14, 2010, at plaintiff's request, the EEOC mailed to plaintiff a Notice of Right to Sue because more than 180 days passed since the filing of the charge. Plaintiff filed her Complaint with this Court on November 9, 2010 and an Amended Complaint on December 10, 2010. (Docket #2).

Plaintiff's First Cause of Action is brought against Westgate for harassment, disability discrimination, and hostile work environment in violation of the Americans with Disability Act, 42 U.S.C. § 12101, et seq., as amended ("ADA"). Plaintiff's Second Cause of Action is asserted against Westgate and Gaulin for harassment, disability discrimination, and hostile work environment in violation of the New York State Human Rights Law, N.Y. Exec. Law, Art. 15 ("Executive Law"). Plaintiff's Third Cause of Action is asserted against Westgate for retaliation in violation of the ADA. Plaintiff's Fourth cause of action is asserted against Westgate and Gaulin for retaliation in violation of the Executive Law. (Docket #2). Defendants filed their Answer to the Amended Complaint on February 22, 2011. (Docket #3).

Defendants deposed plaintiff on May 21, 2012 and plaintiff deposed Gaulin on August 7, and August 29, 2012. Fact discovery is now closed.

Plaintiff now moves for partial summary judgment and respectfully requests that the Court enter judgment as to liability against Westgate on its First Cause of Action brought pursuant to the ADA and on its Second Cause of Action against Westgate and Gaulin under the Executive Law for defendants' termination of her employment based on her disability.[1]

---

[1] By her motion, plaintiff is only seeking summary judgment on her First and Second Causes of Action with respect to defendants' termination of her employment. Plaintiff is not moving for summary judgment with respect to her claims in her First and Second Causes of Action for harassment and hostile work environment and her Third and Fourth Causes of Action for retaliation.

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

The standards governing motions for summary judgment are well settled. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a moving party is entitled to judgment as a matter of law if no genuine issue of material fact exists and the record could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). To defeat a summary judgment motion, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

Defendants cannot do so here because the undisputed material facts set forth in plaintiff's motion papers demonstrate that Westgate violated the ADA and Westgate and Gaulin violated the Executive Law when they terminated Montesano's employment because of her disability, and defendants cannot establish business necessity or undue hardship in failing to provide plaintiff with reasonable accommodation. Indeed, defendants originally accommodated Montesano's disability (thus proving that a reasonable accommodation existed) then removed the accommodation, refused to engage in an interactive process with Montesano, and terminated her employment.

While plaintiff recognizes that a defendant and not the plaintiff typically moves for summary judgment in discrimination cases, courts have entered partial summary judgment in a plaintiff's favor in appropriate disability discrimination cases. *See e.g., Coffman v. Robert J. Young Company, Inc.*, 871 F. Supp.2d 703 (M.D. Tenn. 2012); *Alexander v. Trilogy Health Services, LLC*, 2012 U.S. Dist. LEXIS 152079 (S.D. Ohio October 23, 2012).

## II. PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON HER FIRST AND SECOND CAUSES OF ACTION

Plaintiff's First Cause of Action is brought against Westgate under the ADA, and her Second Cause of Action is brought against Westgate and Gaulin under the Executive Law. Both causes of action are governed by the same legal standards.[2] *See Parker v. Columbia Pictures Industries*, 204 F.3d 326, 332 n. 1 (2d Cir. 2000); *McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 398 n. 2 (E.D.N.Y. 2010). However, the Executive Law defines disability more broadly than the ADA. *McCowan*, 689 F. Supp. 2d at 398 n. 2.

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

To recover under a claim for discriminatory discharge under the ADA and the Executive Law, the employee must show that: (1) she is an individual with a disability; (2) the employer had notice of her disability; (3) the employee could perform the essential functions of her job with reasonable accommodation; and (3) the employer refused to make such accommodation. *Parker*, 204 F.3d at 332. If an employee satisfies the first three elements, the employer's failure to make reasonable accommodation amounts to a discharge "because of" her disability. *Id.*; *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998).

---

[2] There is no issue in this case that Westgate is subject to the ADA and Executive Law because it employed more than 15 employees. (Burns Affidavit at ¶ 11). *See* 42 U.S.C. § 12111(5)(A); Executive Law § 292.

If the plaintiff establishes her *prima facie* case, the employer has the burden to demonstrate that the employee's proposed accommodation would have resulted in undue hardship. *Parker*, 204 F.3d at 332.

### A.     Plaintiff is an Individual with a Disability

There is no question of material fact that plaintiff is an individual with a disability. The ADA defines "disability" as:

> (A)   a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B)   a record of such an impairment; or
>
> (C)   being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(h)(2)(i). "An impairment substantially limits a major life activity other than work if it prevents an individual from performing an activity that the average person in the population can perform, or if it significantly restricts the duration, manner, or condition under which an individual can perform the activity as compared to the ability of the average person in the general population." *McCowan*, 689 F. Supp 2d at 399 (citing 29 C.F.R. § 1630.2(j)(1)).

Further, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, that expanded the class of individuals entitled to protection under the ADA. As stated in *Rohr v. Salt River Project Agric. Imp. and Power Dist.*, 55 F.3d 850, 853 (9th Cir. 2009):

> In the ADAAA, Congress emphasizes that when it enacted the ADA in 1990, it "intended that the Act 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and provide

> broad coverage." The ADAAA rejects the Supreme Court's
> interpretation of the term "disability" in *Sutton v. United Air Lines,
> Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.E. 2d 450 (1999), and
> *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S.
> 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), [18*] and thereby
> expands the class of individuals who are entitled to protection
> under the ADA.

*See also Schroeder v. Suffolk County Community College,* 2009 U.S. Dist LEXIS 52533 at *17-18 (E.D.N.Y. June 22, 2009).

During her employment with Westgate, Montesano had a disability consisting of a vitamin B-12 deficiency that limited plaintiff's ability to walk and plaintiff's fine motor skills as well as macular degeneration that limited plaintiff's ability to see close-up objects with her right eye. Plaintiff required the use of a walker to ambulate since 1996. (Montesano Dep. at 31, 32, 33, 34, 62, 63, 104). Under settled law, plaintiff's inability to walk without a walker is a disability under the ADA. *Schroeder,* 2009 U.S. Dist LEXIS 52533 at *20 ("It is evident that a major life activity relevant to this case is walking"); *Gee v. Minnesota State Colleges and Universities, et al.,* 700 N.W. 2d 548, 554 (Ct. App. Minn. 2005) (under the ADA, the definition of "major life activities" includes walking).

### B. Defendants Had Notice of Plaintiff's Disability

There is no question of material fact that defendants had notice of Montesano's disability. Prior to being hired by Westgate, Montesano disclosed to LaMagna that Montesano had certain physical disabilities and limitations that affected her mobility and eyesight. As a result, LaMagna and Westgate knew that Montesano would have less mobility than other Westgate nurses. (LaMagna Affidavit at ¶10) (Montesano Dep. at 13, 43, 66, 67) (Gaulin Dep. at 114, 149, 256). When Montesano started working at Westgate, she used and required a walker to help her ambulate. (LaMagna Affidavit at ¶11) (Montesano Dep. at 34, 40, 106) (Gaulin Dep. at 90).

In addition, LaMagna was criticized by Westgate employee Anita Meyers, who was Westgate's Office Manager, for hiring Montesano because of Montesano's disabilities and limitations. (LaMagna Affidavit at ¶12). Further, Gaulin told Montesano that if Montesano did not get the scooter, she would be fired. (Gaulin Dep. at 123, 204). Under settled law, defendants had notice of Montesano's disability.

### C. Plaintiff Could Perform the Essential Functions of Her Job with Reasonable Accommodation

There is no question of material fact that Montesano could perform the essential functions of her job for which she was hired with reasonable accommodation. Despite Montesano's limitations and disabilities, LaMagna determined Montesano could perform the essential functions of the job for which Montesano was hired with appropriate and reasonable accommodations. Indeed, while LaMagna was at Westgate, LaMagna believed Montesano met or exceeded all of LaMagna's expectations as a Westgate employee, and LaMagna never had any problem or difficulty with Montesano's work performance. In LaMagna's opinion, Montesano was a fine nurse whose commendable work performance made her an asset to Westgate. (LaMagna Affidavit at ¶14).

The record further demonstrates that while Montesano and LaMagna worked together at Westgate, Montesano spent almost all of her time performing her duties while working at her desk, which was located near the nurse's station on the second floor of the building. (LaMagna Affidavit at ¶13) (Montesano Dep. at 22, 40, 43) (Gaulin Dep. 93). Montesano did not need to ambulate to perform these duties.

In contrast to LaMagna's view of Montesano, almost immediately after Montesano was hired, Gaulin had concerns about Montesano's use of a walker and the fact that Montesano was totally dependent on it. (Gaulin Dep. at 103, 104, 105). Accordingly, Gaulin told Montesano

that if Montesano did not get a scooter (which Montesano did and paid with out of her own funds), she would be fired. (Montesano Dep. at 38, 39, 37, 77) (Gaulin Dep. at 123, 204). Despite this, Gaulin acknowledged that there was nothing about Montesano's medical condition that precluded Montesano from working at Westgate. (Gaulin Dep. at 112).

Under settled law, plaintiff has established that she could perform the essential functions of her job for which she was hired with reasonable accommodation based on the fact that she did so for six months until LaMagna left Westgate.

### D.   Accommodating Plaintiff's Disability Did Not Result in Undue Hardship to Defendants

For the same reasons, there is no question of material fact that accommodating Montesano's disability did not result in undue hardship to defendants. Montesano disclosed to LaMagna that Montesano had certain physical disabilities and limitations that affected her mobility and eyesight. As a result, LaMagna and Westgate knew that Montesano would have less mobility than other Westgate nurses. (LaMagna Affidavit at ¶10) (Montesano Dep. at 13, 43, 66, 67) (Gaulin Dep. at 114, 149, 256). Despite Montesano's limitations and disabilities, LaMagna determined Montesano could perform the essential functions of the job for which Montesano was hired with appropriate and reasonable accommodations and for the next six months, Montesano was able to perform her duties as a Westgate employer successfully and without any undue hardship to Westgate.

When Gaulin substantially changed plaintiff's duties and mandated under penalty of termination that if Montesano did not purchase a scooter out of her own funds to increase her mobility, Westgate refused to continue to provide the accommodations LaMagna provided to Montesano when Montesano was hired. Westgate's refusal to continue to make its reasonable accommodation to Montesano after LaMagna left Westgate's employment amounted to a

discharge "because of" her disability as a matter of law. *Parker*, 204 F.3d at 332; *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998).

In addition, under the ADA, employers must "share responsibility for determining an appropriate accommodation through a flexible interactive process. . . . Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate and reasonable accommodations. . . . [T]he employer must make a reasonable effort to determine an appropriate accommodation based on the particular job involved and consultation with the employee." *Schroeder* at *48-49 (internal citations and quotations omitted). Here, defendants did just the opposite. Montesano identified her disability and LaMagna agreed to and set in place reasonable accommodations. However, Gaulin and Westgate later took away the accommodations and made no effort to engage in an interactive process with Montesano, or to re-implement any accommodations. Incredibly, defendants made no reasonable effort, or any effort at all. Instead, Gaulin and Westgate terminated Montesano's employment.

### E.   Gaulin is Liable Under the Executive Law as an Aider and Abettor

Section 296(6) of the Executive Law provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article."

For aider and abettor liability to be imposed, plaintiff must establish that the "defendant *actually participated* in the conduct giving rise to the claim of discrimination." *Brice v. Security Operations Systems, Inc.*, 2001 U.S. Dist. LEXIS 1856 at *10 (S.D.N.Y. Feb. 26, 2001) (emphasis in original). *See also Tomka*, 66 F.3d at 1317; *Robles v. Goddard Riverside*

*Community Center*, 2009 U.S. Dist. LEXIS 51500 at *8 (S.D.N.Y. June 17, 2009).

"Aiding and abetting liability requires that the aider and abettor 'share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose.'" *Brice*, 2001 U.S. Dist. LEXIS at *11 *(quoting New York Times Co. v. City of New York, Comm'n on Human Rights*, 79 Misc. 2d 1046, 1049 (Sup. Ct. 1974), aff'd, 49 A.D. 2d 851 (1st Dep't 1975), aff'd, 41 N.Y. 2d 345 (1977)). *See also Robles*, 2009 U.S. Dist. LEXIS 51500 at *8. Thus, "to find that a defendant actually participated in the discriminatory conduct requires a showing of 'direct, purposeful participation.'" *Brice*, 2001 U.S. Dist. LEXIS 1856 at *11 *(quoting Cerrato v. Durham*, 942, F. Supp. 388, 396) (S.D.N.Y. 1996)); *see also Robles*, 2009 U.S. Dist. LEXIS 51500 at *8; *Asmolov v. Grand Central Partnership, Inc.*, 2008 N.Y. Misc. LEXIS 9873 at *5 (Sup. Ct. N.Y. County Dec. 10, 2008).

Here the undisputed material facts demonstrate that Gaulin: (1) directly and purposely participated in all the conduct giving rise to plaintiff's claim of disability discrimination; (2) directly supervised plaintiff after LaMagna left Westgate's employment; (3) imposed numerous duties on plaintiff after LaMagna left Westgate that were not part of plaintiff's duties when she was hired by LaMagna; (4) required plaintiff to purchase a scooter out of her own funds or be terminated; (5) terminated plaintiff's employment on July 6, 2009 (and decided within a few days to rescind the termination); (6) moved plaintiff to a new position and failed to give her any training; and (7) terminated plaintiff's employment on September 2, 2009. Accordingly, Gaulin is personally liable under the Executive Law for aiding and abetting liability.

## CONCLUSION

For the foregoing reasons, there are no triable issues of material fact as to plaintiff's First and Second Causes of Action against defendants with respect to defendants' termination of her employment. Accordingly, plaintiff is entitled to partial summary judgment as to liability on both of these causes of action.

Dated: February 15, 2013

**DAVIDSON FINK LLP**

/s/ Andrew M. Burns
Andrew M. Burns
First Federal Plaza
28 East Main Street, Suite 1700
Rochester, NY 14614
(585) 784-4800

Attorneys for plaintiff
Anne M. Montesano